DELICIOUS FOODS COMPANY, INC., A NEBRASKA CORPORATION, AND CHEF FRANCISCO FOODS, INC., A CALIFORNIA CORPORATION, APPELLEES, V. MILLARD WAREHOUSE, INC., A NEBRASKA CORPORATION, APPELLEE, AND L & B CORPORATION, A NEBRASKA CORPORATION, APPELLANT.

507 N.W.2d 631

Filed November 5, 1993.   No. S-91-390.

John R. Douglas, of Cassem, Tierney, Adams, Gotch & Douglas, for appellant.

Rex A. Rezac, of Fraser, Stryker, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., and James T. Ferrini, Thomas A. McDonald, George C. Ellison, and Susan Condon, of Clausen, Miller, Gorman, Caffrey & Witous, P.C., for appellees Delicious Foods and Chef Francisco Foods.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

PER CURIAM.

This negligence action appeal arises from the district court's $2,192,733.37 judgment on the verdict in favor of the plaintiff-appellee Delicious Foods Company, Inc., and its $7,132.94 judgment on the verdict in favor of the plaintiff-appellee Chef Francisco Foods, Inc., against the defendant-appellant, L & B Corporation, for damages suffered as the result of a refrigeration system ammonia leak.

We note at the outset that the record does not disclose the reason Millard Warehouse, Inc., is named a party defendant, nor does it disclose the relationship, if any, of Chef Francisco Foods to either L & B or Delicious Foods. However, because the parties have treated the matter as if Chef Francisco's fate rises or falls with Delicious Foods', we do the same.

One Larry Larsen is engaged in the refrigerated storage business and is the president and sole shareholder of L & B. Larsen had built a warehouse in Lincoln, Nebraska, in which Delicious Foods subsequently leased storage space from L & B. Delicious Foods later expressed an interest in leasing cold storage space in Grand Island, Nebraska. Larsen then formed a partnership named Millard Warehouse, Grand Island, of which

he owns a majority interest, for the purpose of building a warehouse there.

Delicious Foods subsequently entered into an agreement with the partnership, which agreement provided that the partnership would obtain a suitable site and build a warehouse in Grand Island which Delicious Foods agreed to, and did, lease.

The lease requires, in relevant part, that the partnership maintain and keep in good repair all portions of the warehouse, including, without limitation, all of the mechanical equipment. The lease further contains a waiver provision, which reads:

> Lessor and Lessee agree that neither shall be liable to the other for damages to the premises or to any of the contents of the premises, whether owned by Lessee or Lessor, by perils insured against by the party owning such damaged or destroyed property; the Lessor hereby waives any and all rights of recovery from the Lessee for loss caused by the perils of fire and other perils included in the definition of extended coverage, and the Lessee hereby waives any and all right of recovery from the Lessor for loss caused by the perils of fire and other perils included in the definition of extended coverage. Each party hereto shall provide the other party with documentary evidence of the concurrence of their respective insurance carriers with the provisions of this clause.

Delicious Foods did insure itself against the loss occasioned by the ammonia leak.

The partnership also entered into an "Administrative Service Agreement" with L & B whereunder L & B agreed to provide accounting, administrative, marketing, and engineering services to the partnership. In exchange, the partnership pays L & B a fixed monthly fee per square foot of warehouse space.

Roger Kirschenman is L & B's corporate engineer and, through administrative service agreements, provides engineering services to all of the 18 warehouses in which Larsen has an interest. Kirschenman is not a registered engineer, and his experience in refrigeration prior to employment with L & B in 1971 was limited to the repair of refrigeration systems on semi-trailers while employed as a diesel engine mechanic for

$9^1/_2$ months. His formal training consisted of a 1-week workshop in refrigeration systems.

Kirschenman is responsible for engineering the refrigeration systems and has ultimate responsibility for their operation. He supervised the construction of the ammonia refrigeration system for the partnership's warehouse, and interviewed and hired Richard Christianson as the plant engineer of the partnership's warehouse. While the partnership's plant manager was Christianson's immediate supervisor and Christianson addressed routine refrigeration questions to the plant manager, Kirschenman responded to Christianson's questions regarding problems with the system. Although Christianson's paycheck was issued by L & B, the partnership was charged for those wages under the terms of its administrative service agreement with L & B.

Christianson had graduated from an 18-month program in refrigeration, air conditioning, and heating at a trade school in the Omaha area in 1980, which is typical of the training possessed by those hired as refrigeration mechanics by Millard Warehouse and in the industry. He had worked since 1978 servicing refrigeration units while employed by a packinghouse, and continued his employment there until 1984, when the plant closed.

According to Delicious Foods' expert, although one can become qualified as a refrigeration mechanic without a college education, it is the custom and practice of the refrigeration industry that a refrigeration mechanic undergo a 6-month apprenticeship under the supervision of someone engaged in operating a plant as an operating engineer of an ammonia refrigeration unit. However, Christianson did not undergo such an apprenticeship; rather, Kirschenman provided him with operating manuals for the compressors but did not review those manuals with him.

Shortly before the ammonia leak, Christianson noticed that five of the valves were "chattering," which meant that too much gas was passing through the valves because the opening on the bottom of each valve was too big. Kirschenman decided to change the plungers in the defrost valves in order to change the size of the orifices.

After Christianson installed the new plungers, he notified Kirschenman that he was having continuing problems with the valves. Kirschenman told Christianson to see if he could achieve defrosting. As the system defrosted, neither Kirschenman nor Christianson was concerned enough to shut the system down. Although Kirschenman was at the partnership's warehouse following that conversation with Christianson and before the mishap described below, the two had no further discussions about the problem.

It was later discovered that in adjusting the defrost regulator valve which had given him problems, Christianson had improperly adjusted it to the fully closed position. Closing the regulator valve caused a sudden stoppage of the flow of liquid ammonia in the pipe. The liquid ammonia then collected in one of the two blast freezer coils. If the valve had been functioning properly, some of the liquid would have been relieved back to the suction line. Instead, when the main suction valve opened at the end of the defrost cycle, the ammonia moved down the pipe at a high velocity and passed through two elbows. A "liquid hammer" was created when the high-velocity ammonia hit the perpendicular surface of a T installed on the line. The plate blew off, dispensing ammonia throughout the warehouse.

The plan Kirschenman used for the refrigeration system called for the use of an elbow where the line burst, rather than a T. According to Kirschenman, however, that drawing was not a detailed plan which was intended to be followed. The various experts are in disagreement as to whether the use of an elbow would have prevented the bursting of the pipe; one expert theorized that debris in the line could have clogged the valve, thereby causing the pipe to burst, and several experts were of the opinion that the pressure was so elevated that a break somewhere was inevitable.

At the time of the ammonia leak, Delicious Foods had frozen and other food products with a net market value of $2,020,428.12 stored in the warehouse. Some of Delicious Foods' products were directly saturated with liquid ammonia and were discarded immediately. After the remaining product was tested by Delicious Foods' quality control department for taste, odor, and color, the balance of the food was discarded

because it had turned an unacceptable color and released an ammonia smell when heated. It cost $172,305.30 to remove and discard the damaged food.

The county health department also inspected and tested the damaged food, finding that the frozen food had a noticeable odor of ammonia both before and during cooking. Two salvage experts testified that the damaged food which was not hit directly with ammonia could have been sold as salvage for which, according to one expert, Delicious Foods would have netted between $545,515 and $727,334.

L & B urges 17 grounds for reversal, which, as argued, merge to claim that the district court erred (1) in failing to direct a verdict in L & B's favor, (2) in certain of its evidential rulings, and (3) in certain of its instructions to the jury.

We begin by noting that the correctness of the district court's ruling on a motion for directed verdict is to be tested by the rule that a directed verdict is proper only where reasonable minds cannot differ and can draw but one conclusion from the evidence, that is to say, where an issue should be decided as a matter of law. However, in reviewing the action of a trial court, we must treat a motion for directed verdict as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed. Such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence. *Humphrey v. Nebraska Public Power Dist.*, 243 Neb. 872, 503 N.W.2d 211 (1993). Accord *Sell v. Mary Lanning Memorial Hosp.*, 243 Neb. 266, 498 N.W.2d 522 (1993).

L & B argues that it had no duty toward Delicious Foods and that, in any event, nothing L & B did or failed to do was the proximate cause of the ammonia leak.

In claiming that it owed no duty to Delicious Foods, L & B argues that as a matter of law, L & B served as the partnership's agent in maintaining the refrigeration system and was thus protected by the waiver provision of the lease between its principal (the partnership) and Delicious Foods, a third party to the agency relationship between L & B and the partnership.

One acting on behalf of another may do so either as an agent or an independent contractor. The factors to be considered in distinguishing between the two are

> (1) the extent of control which, by the agreement, the employer may exercise over the details of the work, (2) whether the one employed is engaged in a distinct occupation or business, (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision, (4) the skill required in the particular occupation, (5) whether the employer or the one employed supplies the instrumentalities, tools, and the place of work for the person doing the work, (6) the length of time for which the one employed is engaged, (7) the method of payment, whether by the time or by the job, (8) whether the work is a part of the regular business of the employer, (9) whether the parties believe they are creating an agency relationship, and (10) whether the employer is or is not in business. *Erspamer Advertising Co. v. Dept. of Labor*, 214 Neb. 68, 333 N.W.2d 646 (1983). Although the control or right of control is the chief factor to be considered, *Maricle v. Spiegel*, 213 Neb. 223, 329 N.W.2d 80 (1983), no one factor is conclusive, *Eden v. Spaulding*, 218 Neb. 799, 359 N.W.2d 758 (1984).

*Herman v. Bonanza Bldgs., Inc.*, 223 Neb. 474, 479-80, 390 N.W.2d 536, 541 (1986). Accord, *Smith v. Butler Manuf. Co.*, 230 Neb. 734, 433 N.W.2d 493 (1988); *Equilease Corp. v. Neff Towing Serv.*, 227 Neb. 523, 418 N.W.2d 754 (1988).

"Whether an agency exists depends on the facts underlying the relationship of the parties irrespective of the words or terminology used by the parties to characterize or describe their relationship." *Gottsch v. Bank of Stapleton*, 235 Neb. 816, 827, 458 N.W.2d 443, 451 (1990).

In *Curry v. Bruns*, 136 Neb. 74, 76-77, 285 N.W. 88, 89-90 (1939), this court held:

> Under these circumstances we are unable to say, as a matter of law, that [the third party] was the agent or servant of the plaintiff. Whether he was an independent contractor, or an agent or servant, is a question of fact

which must be determined after a consideration of all the evidence in the case. We conclude that the trial court was in error when it instructed the jury that [the third party] was the agent of plaintiff as a matter of law and that the negligence of [the third party], if any, was imputable to the plaintiff. The following rules of law control the decision of the case.

. . . .

The right of control, or the want of it, is determinative of the relationship; for one who has no right of control over another ought not be required to answer for his acts, and, on the other hand, if one has such right of control he should be answerable. Whether or not the right of control exists is ordinarily a question of fact for the jury, and is usually arrived at by inference from the terms of the contract, the character of the employment, and all the relevant facts and circumstances. When the facts are in dispute, or more than one inference can be drawn therefrom, the question is for the jury. *Andres v. Cox*, 223 Mo. App. 1139, 23 S. W.(2d) 1066.

And in *Ginn v. Lamp*, 234 Neb. 198, 450 N.W.2d 388 (1990), this court held that the district court erred in directing a verdict in favor of the defendant in the face of circumstantial evidence that the defendant exercised control over the premises; such evidence was ruled to establish a prima facie case that the defendant was the agent for the landlord and subject to the same duties as the landlord.

However, there are circumstances under which the determination is to be made as a matter of law. For example, in *Smith v. Butler Manuf. Co., supra*, this court determined that as a matter of law, no agency existed between the manufacturer of building components and one who purchased components from it and erected a building for another, and affirmed the trial court's directed verdict for the defendant manufacturer. Likewise, in *Eden v. Spaulding*, 218 Neb. 799, 359 N.W.2d 758 (1984), we held that the trial court erred in submitting the question of agency to a jury and failing to find as a matter of law that the defendant trucker who made deliveries for a number of customers was an independent contractor. In

*Herman v. Bonanza Bldgs., Inc., supra,* we held that in the absence of evidence that the erector of a building was acting primarily for the benefit of the manufacturer, the erector was an independent contractor as a matter of law.

The record here also presents a situation in which the question of the nature of L & B's relationship to the partnership is to be resolved as a matter of law. The uncontroverted evidence is that L & B is generally engaged in the business of installing refrigeration equipment in and providing various services to the various Larsen warehouses; that the partnership exerted no general control over L & B either in the construction of the partnership's refrigeration system or in the replacement of the defective defrost valves; and that L & B has superior refrigeration knowledge. Under these circumstances, L & B was, as a matter of law, not an agent of the partnership, but, rather, acted on behalf of the partnership as an independent contractor.

In reliance upon *Stover v. Ed Miller & Sons, Inc.*, 194 Neb. 422, 231 N.W.2d 700 (1975), L & B next argues that even as an independent contractor, it can have no duty to Delicious Foods because L & B had no contractual relationship with the latter and the party with whom L & B did have such a relationship, the partnership, had accepted L & B's work.

In *Stover*, the plaintiff employee of a general contractor was injured when an excavation dug by the defendant subcontractor collapsed after the excavation had been accepted by the general contractor. In affirming the lower court's grant of summary judgment, this court wrote:

> "A construction contractor is not liable for injuries or damage to a third person with whom he is not in contractual relation resulting from the negligent performance of his duty under his contract with the contractee where the injury or damage is sustained after the work is completed and accepted by the owner." In Shupe v. County of Antelope, 157 Neb. 374, 59 N. W. 2d 710, this court stated: "But we have said of such private contractors that when there is an actual acceptance of the work this relieved him (subcontractor) from any further duty."

*Stover v. Ed Miller & Sons, Inc.*, 194 Neb. at 425-26, 231 N.W.2d at 703.

In *Erickson v. Monarch Indus.*, 216 Neb. 875, 881-82, 347 N.W.2d 99, 106 (1984), we, after quoting from the general rule as set forth in *Stover*, noted:

> The exception to this rule was described in *Florida Freight Terminals, Inc. v. Cabanas*, 354 So. 2d 1222, 1225 (Fla. App. 1978): "An independent contractor is not liable for injuries to third parties after the contractor has completed his work and turned the project over to the owner or employer and it has been accepted by him *unless* the parties were dealing with inherently dangerous elements or the defect at issue was latent and could not have been discovered by the owner or employer."

> In *Simmons v. Owens*, 363 So. 2d 142, 143 (Fla. App. 1978), the court said: "The general rule . . . is subject to the exception that a contractor is not relieved of liability where he creates a dangerous condition or unreasonable risk which is latent and not discoverable by reasonable inspection."

Here, no design or construction defect can be said to have been latent: Both the end cap and the T are in plain view and could have been seen. Nor is an ammonia refrigeration system, albeit subject under certain circumstances to damaging leaks, dangerous. As the warehouses had been turned over to and accepted by the partnership, L & B cannot be held liable for any damages occasioned as the result of the design and construction of the refrigeration system.

That determination does not mean, however, that L & B was entitled to a directed verdict, for the evidence is such that the jury could have found that the ammonia leak was not the result of a design or construction defect, but, rather, was the consequence of L & B's failure to have hired a qualified plant engineer for the partnership; to have properly instructed, trained, or supervised Christianson; or to have properly maintained the system.

In the second assignment of error, L & B asserts that the district court mistakenly excluded evidence that Delicious Foods and the partnership intended to be bound by the waiver

provision and that but for its insurance coverage, Delicious Foods would not have discarded everything stored in the partnership's warehouse.

In proceedings governed by the Nebraska Evidence Rules, the admission and exclusion of evidence is controlled by those rules; judicial discretion comes into play only when the rules make discretion a factor. See, *Cockrell v. Garton, ante* p. 359, 507 N.W.2d 38 (1993); *State v. Thompson, ante* p. 189, 505 N.W.2d 673 (1993); *Petska v. Olson Gravel, Inc.*, 243 Neb. 568, 500 N.W.2d 828 (1993); *Behm v. Northwestern Bell Tel. Co.*, 241 Neb. 838, 491 N.W.2d 334 (1992).

L & B unsuccessfully sought to adduce extrinsic evidence, including that the earlier Lincoln lease between it and Delicious Foods contained a waiver provision very much like the one in question and further recited that if L & B were to build a warehouse at Grand Island, Delicious Foods would have the option of transferring its leased space to the Grand Island warehouse "with all terms to remain the same." It also unsuccessfully sought to prove that Delicious Foods wanted to do business with Larsen and did not care through what Larsen entity that was accomplished and that the two intended that each would look only to its own insurer for any property loss.

The legal reality is, however, that the partnership is a separate and distinct entity from L & B, and both are separate and distinct entities from Larsen. In addition, the lease between the partnership and Delicious Foods is a different contract than the Lincoln lease.

As noted in *Baker's Supermarkets v. Feldman*, 243 Neb. 684, 502 N.W.2d 428 (1993), if the language used in a document is unambiguous, the intent of the parties must be gathered from the contents of the document alone. Accord, *Watmore v. Ford*, 229 Neb. 121, 425 N.W.2d 612 (1988), *overruled on other grounds, Landon v. Pettijohn*, 231 Neb. 837, 438 N.W.2d 757 (1989); *Washington Heights Co. v. Frazier*, 226 Neb. 127, 409 N.W.2d 612 (1987). See, also, *Rowe v. Allely, post* p. 484, 507 N.W.2d 293 (1993) (although parol evidence rule does not apply to prior agreement separate and distinct from written agreement, rule does apply to prior or contemporaneous oral agreement which adds to, alters, varies, or contradicts terms of

fully integrated written document purporting to express terms of agreement).

Not only is there nothing ambiguous in the language of the lease between the partnership and Delicious Foods, but L & B is not a party to that document. Nor is L & B a third-party beneficiary of that contract. As explained in *Properties Inv. Group v. Applied Communications*, 242 Neb. 464, 470, 495 N.W.2d 483, 488 (1993):

> In order for those not named as parties to a contract to recover thereunder as third-party beneficiaries, it must appear by express stipulation or by reasonable intendment that the rights and interests of such unnamed parties were contemplated and provision was made for them. *Alder v. First Nat. Bank & Trust Co.*, 241 Neb. 873, 491 N.W.2d 686 (1992). We have stated that " ' "[a] third-party beneficiary's rights depend upon, and are measured by, the terms of the contract between the promisor and promisee. The right of a third party benefited by a contract to sue thereon rests upon the liability of the promisor, which must affirmatively appear from the language of the instrument when properly interpreted or construed; and the liability so appearing cannot be extended or enlarged on the ground alone that the situation and circumstances of the parties justify or demand further or other liability. . . ." ' " *Osmond State Bank v. Uecker Grain*, 227 Neb. 636, 639, 419 N.W.2d 518, 520 (1988).

There is nothing in the lease to show that L & B's rights were contemplated, and no provision was made in the lease for L & B. L & B is therefore not a third-party beneficiary of the lease between the partnership and Delicious Foods. See, also, *Lauritzen v. Davis*, 214 Neb. 547, 335 N.W.2d 520 (1983) (although because of ambiguities in agreement, court relied upon extrinsic evidence to determine that stock purchase option survived death of beneficiary, court did not rely upon extrinsic evidence to establish rights which survived).

L & B also contends that it should have been allowed to show the exact extent of Delicious Foods' insurance coverage to show that the latter had no motive to, and did not, properly salvage

its products.

We agree with L & B's position that as it is not liability insurance which is involved, the provisions of Neb. Rev. Stat. § 27-411 (Reissue 1989) do not apply. That statute reads:

> Evidence that a person was or was not insured against liability is not admissible upon the issue whether he acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.

But that does not mean the principle announced with regard to liability insurance in *Kresha v. Kresha*, 216 Neb. 377, 344 N.W.2d 906 (1984), does not apply as well to evidence of the existence of other types of insurance. In *Kresha*, we ruled that even when evidence of the existence of liability insurance is otherwise admissible, it may be excluded under the provisions of Neb. Rev. Stat. § 27-403 (Reissue 1989) if the probative value of the evidence is substantially outweighed by, among other things, the danger of unfair prejudice.

What constitutes unfair prejudice is one of those matters the Nebraska Evidence Rules entrusts to the discretion of the trial judge. Here, there was substantial risk that if the jury were to learn that Delicious Foods' loss was virtually fully insured, the jury would decide the issue of L & B's liability on the improper basis that Delicious Foods itself suffered no great damage. *State v. Styskal*, 242 Neb. 26, 493 N.W.2d 313 (1992) (evidence suggesting decisions on improper basis unfairly prejudicial). Thus, the district court did not abuse its discretion in excluding the proffered evidence.

Relying on *Lund v. Holbrook*, 153 Neb. 706, 46 N.W.2d 130 (1951), *overruled on other grounds, Chlopek v. Small*, 224 Neb. 78, 396 N.W.2d 103 (1986), L & B further claims that it was incorrectly precluded from adducing evidence that Delicious Foods settled with its insurer for $1,694,653, an amount less than it sought in this suit. It is true that in *Lund*, we held that the lower court erred in rejecting evidence that the plaintiff settled with his insurer for an amount less than he sought at trial for the value of his truck. The difference,

however, is that in its offer of proof, the defendant in *Lund* expected "to elicit on further cross-examination that the plaintiff in a proof of loss to an insurance company on this accident declared the value of his truck to be very much different from his testimony on the witness stand." *Lund v. Holbrook*, 153 Neb. at 719, 46 N.W.2d at 139. Thus, *Lund* turns not on the fact that the defendant should have been permitted to show the amount of the insurance settlement, but that he should have been able to show that at one time the plaintiff ascribed a different value to the truck than he did at trial. See, also, *Rozark Farms, Inc. v. Ozark Border Elec. Co-op.*, 849 F.2d 306 (8th Cir. 1988).

Here, the evidence in question was directed solely at showing the amount at which Delicious Foods settled with its insurer, not that at one time Delicious Foods represented the value of its damaged and discarded products to be less than it was claiming in the suit or for which it obtained judgment.

The matter is controlled by Neb. Rev. Stat. § 27-408 (Reissue 1989), which provides, in relevant part:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.

Recognizing that settlements have always been looked upon with favor and that courts have deemed it against public policy to subject one who has compromised a claim to the hazard of having a settlement proved in a subsequent lawsuit arising out of the same transaction, we, in *Baker v. Blue Ridge Ins. Co.*, 215 Neb. 111, 337 N.W.2d 411 (1983), held that § 27-408 excludes evidence of a farmer's settlement of his crop damage claim with another insurer. The district court thus correctly applied the *Baker* rule, that § 27-408 excludes evidence that any party to the litigation has settled a claim with a third party concerning the same transaction or subject matter involved in litigation where such evidence is offered.

In the third and last summarized assignment of error, L & B complains that in some instances the district court refused to

instruct the jury in the manner L & B requested, and in another instance improperly instructed the jury in a manner to which L & B had objected.

With respect to the first aspect of this matter, L & B's criticisms that the district court refused to instruct as to L & B's status as an agent of the partnership and as a third-party beneficiary of the lease between the partnership and Delicious Foods were resolved adversely to L & B earlier in this opinion, and for that reason require no further comment. While L & B also complains that the district court refused to advise the jury as to the elements of what constitutes negligence in hiring or supervising another, it does not argue the complaint, and for that reason we do not concern ourselves with it. See, *Lange Indus. v. Hallam Grain Co., post* p. 465, 507 N.W.2d 465 (1993); *Abdullah v. Gunter*, 242 Neb. 854, 497 N.W.2d 12 (1993); Neb. Ct. R. of Prac. 9D(1)d (rev. 1992).

Neither, with respect to the second aspect of this assignment of error, does L & B argue its claim that the district court erred in instructing the jury as to the issues and burden of proof in the case. However, the rule is that a trial court has the duty of instructing the jury on the issues presented by the pleadings and evidence, regardless of whether the court is requested to do so. *Worth v. Schillereff*, 233 Neb. 628, 447 N.W.2d 480 (1989); *Anderson v. Union Pacific RR. Co.*, 229 Neb. 321, 426 N.W.2d 518 (1988). This principle applies to theories of defense as well as those upon which a plaintiff's cause of action is founded, and the failure to so instruct constitutes prejudicial error. *Herman v. Midland Ag Service, Inc.*, 200 Neb. 356, 264 N.W.2d 161 (1978).

In failing to recognize L & B's status as an independent contractor, the district court neglected to instruct the jury that if it were to find that a design or construction defect caused the ammonia leak, then, because the warehouse had been accepted by the partnership, L & B would have no liability to Delicious Foods.

For that reason, the judgments of the district court are reversed and the cause remanded for a new trial in accordance with this opinion.

REVERSED AND REMANDED FOR A NEW TRIAL.